**INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION; International Longshoremen's and Warehousemen's Union, Local 27; International Longshoremen's and Warehousemen's Union, Local 32; International Longshoremen's and Warehousemen's Union, Local 98, Plaintiffs–Appellants,**

v.

**Edwin M. MEESE, Attorney General of the United States; George P. Schultz, Secretary of State of the United States; U.S. Department of Immigration and Naturalization, Defendants–Appellees.**

No. 87–4083.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1988.

Decided Aug. 29, 1989.

As Amended Dec. 20, 1989.

---

Richard S. Zuckerman, Leonard, Carder, & Zuckerman, San Francisco, Cal., for plaintiffs-appellants.

Charles Pinell, Asst. U.S. Atty., Seattle, Wash., for defendants-appellees.

Rick T. Haselton, Lindsay, Hart, Neil & Weigler, Portland, Or., Thomas W. Gleason, New York City, for amicus.

Before NELSON, BOOCHEVER and BRUNETTI, Circuit Judges.

BOOCHEVER, Circuit Judge:

A Canadian innovation in transporting logs by means of self-loading vessels has precipitated this litigation. Plaintiffs, International Longshoremen's and Warehousemen's Union and three local affiliates [1], appeal the district court's denial of their motion for a preliminary injunction and its grant of summary judgment in favor of defendants Edwin Meese, George Schultz, and the Immigration and Naturalization Service ("INS"). The ILWU brought this action to challenge an INS decision characterizing Canadian operators of onboard cranes as "alien crewmen" entitled to enter the United States and operate the cranes to load logs on two logging vessels, instead of excluding them as alien workers. The International Longshoremen's Association ("ILA"), the Master Contracting Stevedore Association, and the Alaska Longshore Employers' Association have filed amicus briefs urging reversal of the district court decision.

We reverse and remand.

## FACTS

Kingcome Navigation Company LTD. (Kingcome) is a Canadian company engaged in the business of transporting logs in the coastal waters of Canada and the United States (normally Alaska and Washington). Kingcome has two logging vessels, the Haida Brave and the Haida Monarch, that are equipped with mounted cranes specifically designed for use on board these vessels. The ships are self-propelled and self-dumping barges.

Previously, logs were either loaded from shore onto barges or were towed by tugboats. These methods of transport proved costly in terms of logs lost at sea and delays caused by inclement weather. The two Haida ships were designed to carry logs on their decks. These ships reduce the manpower necessary to load and unload the logs. The onboard crane allows the ships to load and unload cargo without use of port facilities.

The logs must be loaded in such a manner that the bundles interlock. The logs are stacked on the deck in an interlocking fashion so they stay in place without being lashed to the deck. Failure to load the logs properly could affect the stability of the vessel at sea and during the dumping process. The weight of the logs keeps the ship's propeller and rudder under water. If the load fell off at sea, the ship could lose propeller and rudder immersion until the ballast tanks were flooded. To unload the logs, ballast tanks on one side are partially flooded and the logs slide into the water. The ship could sink if the logs are not loaded in a stable manner.

Kingcome contends that special training is necessary to load logs correctly on its two ships. The crane operators receive on the job training, and one operator testified that an operator gains full competency only after ten months to one year on the job.

It is undisputed that the crane operators do not always travel with the ship on Canadian trips. Rather, the operators are frequently flown to the vessel solely to load or unload the cargo, and then flown out again. The district court stated, however:

> Because their employer is aware of and seeks to satisfy United States immigration laws, the crane operators always enter United States waters on the vessels and remain on them until their return to Canada. They are also listed on the register of crew members during the trips to the United States.

On April 19, 1985, Kingcome wrote to the INS requesting a ruling that its crane operators were "alien crewmen" for the purposes of the immigration laws and thus entitled to work in the United States. On June 5, 1985, the Regional Commissioner of the INS issued an advisory opinion that Kingcome's crane operators were "alien crewmen". The INS stated:

> It has long been held that a mess cook on board a vessel qualifies as a 'crewman' although such a person is not involved with the navigation or handling of the vessel. It follows that a crane operator can also be considered as a 'crewman'

1. The plaintiffs jointly will be referred to as "ILWU".

due to the person 'serving in any capacity on board a vessel,' as set forth in sections 101(a)(10) and 101(a)(15)(D) of the act. [Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101(a)(10) and 1101(a)(15)(D) ].

In response to the expressed concerns of the ILA, the INS issued a memorandum regarding its policy pertaining to the cargo handling activities of alien crewmen. The INS stated its consistent policy since 1964 was that it had " 'no jurisdiction under the immigration laws to restrict the duties or work performed *on board* a vessel or aircraft by a crewman.' " (emphasis added). The INS' policy generally distinguishes activities performed on board the vessel from those performed on shore. "There is nothing in the immigration laws to prohibit a crewman from performing work on board his vessel or at dockside, so long as the duties performed have a direct relationship to what are *normal operations of the particular vessel.*" (emphasis added). The INS stated section 1101(a)(15)(D) defined nonimmigrant crewman as providing "service on board a vessel ... or aircraft." "In consideration of this phraseology and *absent a provision* in the law prohibiting on board cargo handling functions by crewmen, the Service may not impose a policy which characterizes on board activities of crewmen as impermissible." This memorandum was sent to all regional offices.

### PROCEEDINGS BELOW

The ILWU filed a timely complaint seeking a declaration that the defendants' interpretation and application of the "alien crewman" provision in the INA, 8 U.S.C. section 1101(a)(15)(D), was unlawful, and an injunction prohibiting the defendants from allowing alien laborers to perform labor in the United States. In addition to injunctive and declaratory relief, the ILWU sought mandamus relief to compel the defendants to enforce the immigration laws.

The plaintiffs moved for a preliminary injunction. The district court ruled that "[p]laintiffs' motion for preliminary injunction must be DENIED because they have failed to show any probability of success on the merits.... Judgment for the government is, therefore, appropriate." (emphasis in original).

After reviewing the motions, affidavits, depositions and "other documents filed in support and opposition", the district court *sua sponte* granted summary judgment to the defendants in the same order. The court reasoned that the crane operators were crewmen, and required for the normal operation and service of the two vessels. The district court emphasized the unique design of the ships and the special qualifications necessary to operate the onboard cranes, and properly load the ships. The court concluded that these crane operators were properly allowed entry into the United States as alien crewmen.

The ILWU filed a timely notice of appeal.

### DISCUSSION

### I. JURISDICTION

This case arises under the federal immigration laws. Consequently, the district court had subject matter jurisdiction pursuant to 28 U.S.C. section 1331 (federal question) and 8 U.S.C. section 1329 (district court has original jurisdiction over all cases arising under the immigration laws). In addition, the district court had subject matter jurisdiction pursuant to 28 U.S.C. section 1361 because the ILWU sought mandamus relief against federal officers.

This case, however, also involves judicial review of the actions of the INS, an administrative agency. Not every agency decision is subject to judicial review. *See e.g. Heckler v. Chaney*, 470 U.S. 821, 828, 105 S.Ct. 1649, 1654, 84 L.Ed.2d 714 (1985) (citing 5 U.S.C. §§ 701–706 (1982)). Neither party raised the question whether the INS' action was reviewable, but because this question goes to the subject matter jurisdiction of this court, we must raise the question sua sponte.

A. THE ACTION BY THE INS IS REVIEWABLE UNDER THE ADMINISTRATIVE PROCEDURE ACT.

5 U.S.C. sections 701–706 (1982) of the Administrative Procedure Act (APA),

govern judicial review of agency action. Section 702 generally provides a right of judicial review to any person "adversely affected or aggrieved" by agency action. 5 U.S.C. section 702 (1982). Other sections of the APA, however, impose limits on this general right of judicial review. First, section 704 of the APA provides for judicial review of *"final* agency action for which there is no other adequate remedy...." 5 U.S.C. section 704 (1982) (emphasis added). Second, section 701 provides that agency action is unreviewable under the APA to the extent that: "1) statutes preclude judicial review; or 2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)–(2) (1982).

The ILWU brought suit generally challenging the INS's practice of allowing alien workers to perform labor in the United States without certification by the Secretary of Labor allegedly in violation of 8 U.S.C. section 1182(a)(14). Specifically, the ILWU complains of two actions of the INS: 1) its advisory opinion defining alien crewmen to include the Kingcome crane operators; and 2) its declared policy that it lacks jurisdiction over the onboard activities of alien crewmen in United States territorial waters. The INS' advisory opinion and policy statement were based on its interpretation of the INA.

The INS' action is final in the sense that the ILWU has no administrative remedy to overturn the advisory opinion or policy statement. 5 U.S.C. section 704 only requires that a putative plaintiff exhaust administrative remedies. *See e.g., Capital Tel. Co. v. FCC,* 777 F.2d 868, 870 (2d Cir.1985) (per curiam) (agency action was final where no further administrative proceedings were possible and order determined legal rights and obligations of parties).

Likewise, the INS' action does not fall into either of the two categories of unreviewable agency action under section 701. First, the INS does not argue that the INA precludes judicial review of its policies, decisions, or interpretations of the statute. Rather, "[w]e begin with the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986); *see Moapa Band of Paiute Indians v. Department of Interior,* 747 F.2d 563, 565 (9th Cir.1984) ("[p]reclusion of judicial review is not lightly inferred, and usually will not be found absent a clear command of the statute."). In this case, there is no indication that Congress sought to prohibit judicial review.

The only question is whether the INS' action is "committed to agency discretion by law" within the meaning of 5 U.S.C. section 701(a)(2). "The legislative history of the Administrative Procedure Act indicates that [§ 701(a)(2)] is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is *no law to apply.'"* *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)) (emphasis added). In this case there is law to apply in the definitions of "alien crewmen" and Congress' enunciated purpose to protect American jobs.[2]

---

**2.** At oral argument, the ILWU suggested that we could order the INS to levy fines against Kingcome under 8 U.S.C. section 1287. In *Chaney,* the Supreme Court held that an agency's refusal to prosecute or enforce a statute in a specific case is presumptively unreviewable under section 701(a)(2). *Chaney,* 470 U.S. at 831–32, 105 S.Ct. at 1655–56; *see also Railway Labor Executives Ass'n v. Dole,* 760 F.2d 1021, 1024 (9th Cir.1985). "That discretion is necessary for the agency to order its priorities and allocate its resources." *Bresgal v. Brock,* 843 F.2d 1163, 1169 n. 1 (9th Cir.1987). In *Bresgal,* this court upheld a district court's declaratory judgment that forestry workers were included within the definition of "agricultural workers" for purposes of the Farm Labor Contractor Registration Act, and granted a permanent injunction ordering the Secretary to "cease refusing to enforce the [Act] ... for all predominately manual forestry work...." *Id.* at 1171–72. Although we cannot order the INS to assess penalties against the Kingcome ships in the absence of evidence that the INS abdicated its responsibility under the Act, *see Chaney,* 470 U.S. at 833 n. 4, 105 S.Ct. at 1656 n. 4, we can interpret the INA and the INS definitions of "alien crewmen" in light of the statutory definitions and section 1182.

We have jurisdiction pursuant to 28 U.S.C. section 1291 to review the district court order dismissing the ILWU's complaint.

## B. THE ILWU HAS STANDING TO CHALLENGE THE INS' ACTION.

█ The doctrine of standing arises from the "case or controversy" requirement of Article III of the Constitution. *See, e.g., Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). A plaintiff must allege three elements to satisfy the constitutional component of standing: 1) injury in fact; 2) a fairly traceable causal connection between defendants' conduct and the injury; and 3) the injury is likely to be redressed by the relief sought. *See id.* at 751; *see also Railway Labor Executives,* 760 F.2d at 1023. The ILWU satisfies the requirements for standing.

In this case the ILWU's injury is not hypothetical or abstract. Because of foreign competition ILWU members have lost an opportunity to compete for what they contend are traditional longshore jobs. In *Association of Data Processing Serv. Org. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Supreme Court held that allegations of injury resulting from lost opportunities to compete for economic benefits are sufficient for standing purposes. *See id.* at 152, 90 S.Ct. at 829; *see also International Union of Bricklayers and Allied Craftsmen v. Meese,* 761 F.2d 798, 802 (D.C.Cir.1985); *International Union of Bricklayers and Allied Craftsmen v. Meese,* 616 F.Supp. 1387, 1394 (N.D.Cal. 1985).

The ILWU's alleged injury was caused by the INS' actions. Although under 8 U.S.C. section 1182(a)(14) the Secretary of Labor could certify that the Kingcome crane operators were eligible to work in the United States, the INS' action deprived the union members of the protections afforded by the certification procedure. *See International Union of Bricklayers,* 616 F.Supp. at 1395. Consequently, the ILWU's alleged injuries are "fairly traceable" to the INS' conduct.

The ILWU's injuries are likely to be redressed by a favorable ruling. The ILWU seeks: 1) a declaration that alien crewmen are subject to the certification procedures contained in section 1182; and 2) an injunction forcing the INS to enforce the immigration acts. Such relief would force Kingcome to seek certification of its crane operators by the Secretary of Labor, and the ILWU's members would have the protection envisioned by Congress.

Finally, the ILWU satisfies the prudential components of standing. First, courts have long recognized the right of unions' to bring lawsuits on behalf of themselves and their members. Second, the ILWU and its members are within the "zone of interests" protected by the INA. A primary purpose of the immigration laws, with their quotas and certification procedures, is to protect American laborers. *See, e.g., Wang v. INS,* 602 F.2d 211, 213 (9th Cir.1979) (quoting S.Rep. No. 748, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News 3328, 3333).

## II. STANDARD OF REVIEW

The government contends that plaintiffs' action was for mandamus relief since plaintiffs sought "the district court to issue orders in essence directing the federal defendants to prevent some crane operators aboard specialized log carrying vessels from using cranes aboard the vessels", and that we should review the district court's decision based on the requirements for granting the remedy of mandamus. The ILWU, however, requested both declaratory and injunctive relief.

█ Also, the district court granted summary judgment based on its interpretation of the INA. Interpretation of a statute is a question of law reviewed *de novo. See, e.g., Trustees of Amalgamated Ins. Fund v. Geltman Indus.,* 784 F.2d 926, 929 (9th Cir.), *cert. denied,* 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986). While an agency's interpretation of its statute is entitled to deference, "the courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute ... that are incon-

sistent with the statutory mandate or that frustrate the [policies] that Congress sought to implement." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981).

Because the district court's grant of summary judgment to the defendants disposed of the case on the merits, our reversal requiring entry of summary judgment for the ILWU renders it unnecessary for us to discuss the denial of the preliminary injunction.

## III. THE STATUTORY FRAMEWORK

The INA regulates the admission and condition of entry of all aliens. An alien is defined as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3) (1982). The term alien encompasses two groups of people: immigrants and nonimmigrants. Although there is a statutory presumption that all aliens are immigrants, *see* 8 U.S.C. § 1184(b), generally immigrants are aliens who apply for permanent admission to the United States. 1 C. Gordon & H. Rosenfield, *Immigration Law and Procedure,* § 2.5b p. 2–42 (1986). Immigrants are subject to the numerical quota limits established in the Act (section 1151), and are admitted according to a system of preferences (section 1153). Nonimmigrants, on the other hand, generally enter only for a limited time, and for a specific purpose. 1 C. Gordon & H. Rosenfield, *supra,* § 2.6.

Section 1101(a)(15) establishes special classes of nonimmigrant aliens including:

(D)(i) an alien crewman serving in *good faith as such in any capacity required for normal operation and service on board a vessel* (other than a fishing vessel having its home port or an operating base in the United States) or aircraft, who intends to land temporarily and solely in pursuit of his calling as a crewman and to depart from the United States with the vessel or aircraft on which he arrived or some other vessel or aircraft.

8 U.S.C. § 1101(a)(15)(D)(i) (Supp. IV 1986) (emphasis added).

The government contends that the immigration laws do not apply to alien crewmen until they seek shore leave pursuant to 8 U.S.C. section 1282. The ILWU argues, however, that section 1182(a)(14) bars the admission of alien crewmen who perform duties in United States territorial waters. Section 1182(a) establishes classes of excludable aliens and states: "[e]xcept as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States."

(14) Aliens seeking to enter the United States, *for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General* that (A) there are not sufficient workers who are able, willing, qualified ..., and available at the time of application for a visa and admission to the United States ..., and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.

8 U.S.C. § 1182(a)(14) (1982) (emphasis added).

The purpose behind this section is to protect American workers from an influx of foreign skilled and unskilled labor. S.Rep. No. 748, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin. News 3328, 3333; H.Rep. No. 1365, 82nd Cong., 2nd Sess., *reprinted in* 1952 U.S. Code of Cong. & Admin.News 1653, 1705; *see also Wang,* 602 F.2d at 213. There is also a similar certification procedure for the class of nonimmigrants that are specifically authorized to enter and work within the United States. *See* 8 U.S.C. § 1101(a)(15)(H) (nonimmigrants who intend to work in seasonal industries, such as agriculture, provided that the Secretary determines that unemployed persons capable of performing such work cannot be found in the United States).[3]

---

**3.** 8 U.S.C. section 1184(c) authorizes the Attorney General to determine whether an alien is admissible as an H–2 temporary worker. 8 U.S.C. § 1184(c) (Supp. IV 1986). The Attorney

Initially, the ILWU argues that even if section 1101(a)(15) allows alien crewmen entry into the United States, it does not authorize them to work in the United States. Although the ILWU is correct that entry into the United States does not automatically confer an entitlement to work in the United States, work authorization for alien crewmen is inherent in their classification. *See* 1 C. Gordon & H. Rosenfield, *Immigration Law and Procedure* § 1.34 pp. 1–168 (1986); *see also* 1 A.P. Mutharika, *The Alien Under American Law,* Chapter III, p. 4 & 7 (1980) ("In the case of an alien admitted temporarily in one of the 12 nonimmigrant classification, work authorization may be inherent in the alien's classification.") The ILWU does not seriously contend that bona fide "alien crewmen" must cease their normal duties upon entering United States territorial waters or airspace. *See* A.P. Mutharika, *supra,* at p. 7 ("A crewman can work on his vessel in U.S. port so long as the work has a direct relationship to the normal operation of the vessel. For example, a crewman may load ship's stores, but not cargo."). Rather the parties dispute the scope of the definition of an alien crewman.

In determining whether the crane operators are alien crewmen, we look to cases defining "crewman" in the context of general admiralty law and the Longshore and Harbor Workers' Compensation Act, while being guided by the purposes of the specific provisions of the Immigration Act here at issue. We are also cognizant that the admiralty "definitions of 'member of a crew' and the tests to be applied in determining the status of a worker, as set forth in the different opinions, are so many and varied that any attempt at reconciliation would prove futile." *Puget Sound Freight Lines v. Marshall,* 125 F.2d 876, 878 (9th Cir.1942).

The government argues that a crewman is defined as "a person serving in any capacity on board a vessel or aircraft", 8 U.S.C. § 1101(a)(10), and since the Kingcome crane operators work on board their vessels, they are alien crewmen. Such a broad definition of "crewman" ignores the limitations on the term established elsewhere in the Act, regulations, and case law. *See In re M/T "Rajendra Prasad",* 16 I. & N.Dec. No. 2696, 705, 708 (BIA 1979). To qualify for nonimmigrant status an alien crewman must be "serving in good faith as such in any capacity required for *normal operation and service on board a vessel....*" 8 U.S.C. § 1101(a)(15)(D)(i) (Supp. IV 1986) (emphasis added). Regulations issued by the State Department further limit the definition of crewmen by excluding:

> An alien employed on board a vessel or aircraft in a capacity not required for normal operation and service, *or* an alien employed or listed as a regular member of the crew in excess of the number normally required....

22 C.F.R. § 41.41(b) (1988) (emphasis added).

There is little case law interpreting the phrase "normal operation and service on board a vessel". In a 1983 Service Memorandum involving a fishing vessel named the *Golden Alaska,*[4] however, the INS provided an interpretation of this section. The *Golden Alaska* was a U.S. flag vessel that operated outside the three mile territorial limit but within the 200 mile Fishery Conservation Zone. The ship employed 12 aliens who processed fish aboard the ship. The issue was whether these employees were nonimmigrant alien crewmen.

The INS rejected the argument that the fish processors were necessary for the normal operation of the vessel because the overall mission of the ship was to process fish at sea. The INS cited 22 C.F.R. § 41.35(b) (codified now at 22 C.F.R. § 41.41(b) (1988)), and stated that:

General has promulgated a regulation that requires the employer of the alien, or the alien to submit with their petition a labor certification that there are no unemployed persons in the United States available to perform the work. *See* 8 C.F.R. § 214.2(h)(3) (1988).

**4.** This 1983 memorandum was written by the then General Counsel of the INS, Maurice Inman, Jr.

The implication inherent in this provision is that there is a distinction in function between crewmen, some of whom are required for the normal operation and service on the particular vessel, and others who function in capacities unrelated to navigation. . . .

It may be argued that "normal operation" refers to the *overall mission of the vessel, and that since the central purpose of the* Golden Alaska *is to process fish at sea, fish processors are required to serve as part of its "normal" operation.* However, this interpretation is unlikely in view of the restrictive definition of the word "crew."

*Golden Alaska,* at 5 (emphasis added).

This distinction was reiterated by the Board of Immigration of Appeals in a 1979 case. *Rajendra Prasad,* 16 I. & N.Dec. 2696 (BIA 1979). In *Rajendra Prasad,* the BIA had to interpret the word "crewman" for purposes of the administrative fine provisions of the Act. Spouses and children of foreign officers were held not to be crewmen, and consequently the Board held the ship was properly fined since these aliens entered the United States without proper visas. The Board stated "[t]he contention is essentially that the aliens' presence contributes to the functioning of the vessel's mission, *but not to the functioning of the vessel itself.*" *Id.* at 708.

The INS in the *Golden Alaska* memorandum noted that the federal courts had consistently defined "crew" to apply to those who are "naturally and primarily on board to aid in the navigation of a ship." (citation omitted); *see also South Chicago Coal & Dock Co. v. Bassett,* 309 U.S. 251, 260, 60 S.Ct. 544, 549, 84 L.Ed. 732 (1940) (decedent was not a "member of the crew" because "he had no duties while the boat was in motion" but rather was in the position of a longshoreman); *Diomede v. Lowe,* 87 F.2d 296, 298 (2d Cir.), *cert. denied,* 301 U.S. 682, 57 S.Ct. 783, 81 L.Ed. 1340 (1937). The phrase "aid to navigation" was not limited to traditional sailors who aided the navigation of the ship but also encompassed cooks, engineers and other workers with a permanent connection to the ship.

*See Williams v. Avondale Shipyards, Inc.,* 452 F.2d 955, 958 (5th Cir.1971); *see also Ex parte Kogi Saito,* 18 F.2d 116, 118 (W.D.Wash.1927) (fulltime cook was a "seaman" for purposes of the immigration laws); *Puget Sound,* 125 F.2d at 879 (employee who sailed with a vessel but whose duties were those of a longshoremen was not a "member of the crew" for purposes of the Longshore and Harbor Workers' Compensation Act).

We discern three factors relevant to the classification of a ship employee as an alien crewman: 1) the nature of the employee's duties; 2) when those duties are performed; and 3) whether the employee has a permanent connection with the ship. These factors cannot be applied in isolation. *See Harney v. William M. Moore Bldg. Corp.,* 359 F.2d 649, 654 (2d Cir.1966) ("A less permanent connection with the ship might require a more significant navigational function."). Applying these factors we find that the Kingcome crane operators are not alien crewmen for purposes of the immigration acts.

First, cargo handling is not an activity associated with traditional crewmen, but is ordinarily associated with longshore laborers. *See South Chicago,* 309 U.S. at 260, 60 S.Ct. at 549; *Puget Sound,* 125 F.2d at 878. Second, these operators do not aid in the navigation like fulltime cooks because their primary and substantial duties occur not while the ship is underway, but rather once they have entered United States territorial waters to load or unload the cargo. In *Puget Sound,* we held that an employee who sailed with a vessel but performed cargo handling functions was not a "member of the crew". We stated:

He has no duties while the vessel is underway. He is in reality a traveling longshoreman and does anything he desires to pass the time while en route from port to port. . . .

"In short, the claimant's duties were the same as any regularly employed longshoreman on Puget Sound with the exception that he traveled from port to port with the vessel."

*Id.* (quoting appellant's brief). The defendants contend that the Kingcome operators are responsible for the repair and maintenance of the cranes, and that sometimes these repairs would occur while the ships were at sea. The repair and maintenance duties of these operators are minimal and insubstantial at best. Their primary duty remains to load and unload cargo once the ships enter United States territorial waters. The fact that the crane operators do not travel with the ship on the trips solely within Canada demonstrates the insignificance of these repair duties. Otherwise, the crane operators would travel with the ships throughout the entire Canadian trips as well as on the voyages to the United States. We see no principled difference between the traveling longshoreman in *Puget Sound* and Kingcome's crane operators.

Third, these operators do not have a permanent connection with the ship. Although they travel with the ships on trips to the United States ostensibly to comply with the immigration laws, it is undisputed that they frequently fly to the ship on the trips within Canada when it is time to load or unload the cargo. This fact also demonstrates that the workers are not in "good faith" necessary for the operation of the vessel although they might facilitate its general mission.[5]

 The district court held that these crane operators were crewmen since their activities were "required for normal operation and service of the *particular* vessel on which they work." (emphasis added). The court relied on the unique design of the ships, and the apparent necessity of loading the logs properly. The district court's opinion could be read in one of two ways. Either the crane operators were necessary to the normal operation of the vessels since they were cargo carrying ships, or they were necessary because they were the only ones qualified to load the logs correctly. To the extent the opinion is based on the former, the district court fails to distinguish between the operation of the vessel and its overall mission, and relies on an incorrect legal standard. To the extent it is based on the latter, it engages in a certification inquiry that Congress has entrusted to the Secretary of Labor under section 1182. If the Secretary of Labor determines that the crane operators are the only ones qualified to perform this work safely, then the Secretary can certify them pursuant to section 1182.

This court recognizes that ordinarily an agency's interpretation is entitled to deference, however, courts must reject an administrative construction of a statute that is inconsistent with the statutory mandate or that frustrates Congress' purpose. *See, e.g., Federal Election Comm'n,* 454 U.S. at 31–32, 102 S.Ct. at 41–42. To the extent that the INS memorandum concerning the Kingcome crane operators looked solely to whether the work was performed on board the vessel to determine whether the workers were alien crewmen, we believe it was contrary to its prior interpretations, and the purposes of the Act. Consequently, we need not give deference to it. In the *Golden Alaska* memorandum the INS stated that:

> As a result, it is evident that the *Golden Alaska's* fish processors are not required

---

**5.** We do not suggest that the three factors are exclusive in determining whether an employee aboard a foreign vessel is a bona fide alien crewman. We recognize that a plausible argument could be made based on these factors that the *Golden Alaska* fish processors are alien crewmen because they performed their duties while the ship was in navigation and have a permanent connection with the ship. When an employee's primary duties are not traditionally associated with maritime activity, the main inquiry remains whether the person is on board to facilitate the operation of the *vessel* or its general mission. Cooks, although engaged in nontraditional maritime duties, are necessary for the operation of the vessel because they service the crew on board the vessel. Similarly, engineers are on board to facilitate the repair of machinery necessary for the operation of the vessel. In the *Golden Alaska* and this case, the alleged alien crewmen are necessary only for the operation of machinery independent of the navigation of the ship. In the *Golden Alaska* the INS stated: "Further, fish processing is a task wholly independent of the navigation of a ship...." *Golden Alaska* at 6. The same rationale applies in this case since the cranes, although located on board the vessels, are independent of the navigation of the vessel.

for the normal operation of the ship within the meaning of 8 U.S.C. 1101(a)(15)(D), *but are in fact laborers performing their work at a veritable floating processing plant supported by "crew".*

*Golden Alaska,* at 6 (emphasis added). The INS' new policy, by looking solely to whether the activities are performed on board a vessel and by its expansive definition of crewman, encourages such an influx of floating processing centers, restaurants and other operations.

Last, this definition of alien crewmen better promotes Congress' purpose of protecting American laborers from an influx of skilled and unskilled labor. " '[I]t is the duty of the court to give significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose, and to give effect to the statute as a whole, and not render it partially or entirely void.' " *Bresgal,* 843 F.2d at 1166 (quoting *Matter of Borba,* 736 F.2d 1317, 1320 (9th Cir.1984)). By limiting the class of nonimmigrant alien crewmen to foreign crewmen whose primary and substantial duties occur while the ship is in navigation, Congress' purpose of protecting American jobs is advanced. Also, if a crewman's primary duties occur while the ship is at sea, then the crewman's entry into the United States could hardly be construed "as for the purpose of performing skilled or unskilled labor" in violation of section 1182(a)(14).

■ The government also contends that "there was no showing that the crane operators actually enter the United States as that term is applied to the crew of vessels in U.S. waters because the crane operators never leave the vessel." An "entry," however, is not a prerequisite to the applicability of the immigration laws; those laws are triggered whenever an alien merely arrives in the United States, regardless of whether he actually effectuates an "entry." The territorial waters surrounding this country are classified as part of the United States.

*See* 8 C.F.R. § 287.1(a)(1) (1988); *see also Cunard S.S. Co. v. Mellon,* 262 U.S. 100, 122, 43 S.Ct. 504, 506–07, 67 L.Ed. 894 (1923); *Lazarescu v. United States,* 199 F.2d 898, 900–901 (4th Cir.1952) ("The port and harbor of Baltimore is territory of the United States.").[6] Thus, if persons employed aboard a foreign vessel do not fall within the definition of an alien crewman, then their arrival into U.S. territorial waters could violate provisions of the Act.

### CONCLUSION

We hold that Kingcome's crane operators were not alien crewmen within the meaning of the immigration laws.

**REVERSED AND REMANDED.**

---

**6.** Congress extended the jurisdiction of the United States and its laws to the outer Continental Shelf in 1953. *See* 43 U.S.C. § 1333(a)(1). The outer Continental Shelf is defined as land submerged beyond the three mile limit. In *Pile-drivers' Local Union No. 2375 v. Smith,* 695 F.2d 390, 393 (9th Cir.1982), we held that the INA applied to this submerged land and structures erected on it.